SMITHBRIDGE, LLP
BY: Andrew M Smith, Esquire
Two Penn Center
1500 JFK Blvd, Suite 900
Philadelphia, PA 19102
(215) 564-LAW1
Andrew@Smithbridgellp.com
COUNSEL FOR PLAINTIFFS

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| ADAM JOSHUA FEELEY; HEATHER MITTS; BRENT CELEK; and KEVIN CURTIS | : : : |
| Plaintiffs, | : : |
| v. | : : |
| SUNTRUST BANK, INC; MARTIN KELLY CAPITAL MANAGEMENT, LLC; WILLIAM CRAFTON, JR.; CSI CAPITAL MANAGEMENT, INC; John Does 1-50 | : : **COMPLAINT AND JURY DEMAND** : : |
| Defendants. | : |

---

## INTRODUCTION

1.      Plaintiffs Adam Joshua Feeley, Heather Mitts, Brent Celek and Kevin Curtis (together, "Plaintiffs") bring this action against Defendants SunTrust Bank, Martin Kelly Capital Management, LLC, CSI Capital Management, Inc., William C. Crafton, Jr. and John Does numbers 1 through 50 (collectively, "Defendants").

2.      The allegations herein are based upon personal knowledge, information, belief, and the continuing investigation of Plaintiff's counsel.  Some facts alleged herein are derived from the Complaint and Civil action SEC v. Westmoore Management, LLC et al, USDC N. SACV10-00849 AG(MLX), which was filed in the Central District of California on June 15, 2010.  Many facts related to Plaintiff's allegations are known only to Defendants or are exclusively within their control.  Substantial evidentiary support will therefore, be developed after reasonable discovery.

3.      Defendant Crafton was a registered representative, agent, employee, member, owner, partner, and/or shareholder of Defendants CSI, Martin Kelly Capital Management, LLC and SunTrust Bank at the relevant times material hereto and for the reasons set forth below, each Defendant is liable for the conduct of Crafton and others working with Crafton.

4.      Plaintiffs are each individual investors/clients of William Crafton, Jr., who together with Crafton's investment advisory companies (Defendants CSI, Martin Kelly Capital Management and SunTrust) managed, controlled, monitored, maintained, handled and invested in excess of $7,500,000 million dollars of Plaintiffs' assets.  Plaintiffs join together to seek damages for losses incurred by them due to Defendants' misrepresentation, mismanagement, fraud, omissions, concealment, negligence, lack of supervision, breach of fiduciary responsibilities and other wrongful conduct.

## THE PARTIES
### Plaintiffs Adam Joshua Feeley, Heather Mitts, Brent Celek, and Kevin Curtis

5.      ADAM JOSHUA FEELEY is an individual and resident of Philadelphia, Pennsylvania who plays professional football for the St. Louis Rams, who was introduced to William Crafton, as a financial advisor while playing for the Philadelphia Eagles in 2003.  Mr. Feeley's roommate at the time was Brandon Whitting, another NFL player and Philadelphia Eagle, who at that time was using Defendant Crafton as his financial advisor.  Crafton solicited Feeley through Whitting.

6.      HEATHER MITTS is an individual and professional soccer player, who is married to Plaintiff A.J. Feeley and similarly resides in Philadelphia, Pennsylvania.   Crafton solicited Mitts through A.J. Feeley.

7.      BRENT CELEK is an individual and resident of Philadelphia, Pennsylvania who plays professional football for the Philadelphia Eagles. Mr. Celek was a teammate of Feeley in 2007 and Celek was solicited by William Crafton through Celek's teammates and other NFL players.

8.      KEVIN CURTIS is an individual and resident of Park City, Utah who plays professional football for St. Louis Rams.  In 2003 Curtis first met Defendant Crafton prior to his rookie year in the NFL and after a few years of being solicited by Crafton, Curtis engaged Crafton as his financial advisor in 2006 while playing for the St. Louis Rams.  In 2007 Curtis

signed as a free agent with the Philadelphia Eagles where he became teammates of Plaintiffs A.J. Feeley and Brent Celek, each of whom were clients of Defendant Crafton.

9.     Defendant William Crafton became the financial advisor for each of these professional athletes, managing almost all of the income and assets each obtained through their respective professional football and soccer contracts.

10.     Upon information and belief, William Crafton also represents at least 20 other professional athletes including players in the N.F.L., National Hockey League (NHL) and Major League Baseball (MLB).  William Crafton's clients were and are commonly referred to in the financial industry as his "roster" and Crafton consistently used these athletes names and personas to solicit other professional athletes.

### Defendants William Crafton, Martin Kelly Capital Management, CSI, SunTrust and John Does numbers 1-50

11.     Defendant **WILLIAM CLAY CRAFTON, Jr**. is a resident of San Diego, California and holds himself out to the general public and more specifically to professional athletes, as a licensed, registered and insured financial advisor.  Based upon initial investigation, Crafton was at all times material hereto a member, shareholder, principal, owner, partner, employee, salesman, servant, agent, broker, representative and/or independent contractor of Defendants SunTrust, CSI and Martin Kelley and Crafton is/was registered as a financial advisor with American Express Financial Advisors, IDS Life Insurance Company, Martin Kelly Capital Management, LLC, CSI Capital Management, Inc and SunTrust Bank.

12.     At times material hereto, and specifically in or around March, 2003 and continuing thereafter, Crafton was a representative, broker, agent, employee and registered investment advisor with **Defendant CSI CAPITAL MANAGEMENT, INC** (hereinafter "CSI"), a duly licensed and registered investment advisory firm and wealth management company specializing in the investment and asset management of professional athletes, with its primary office address located at 600 California Street, 18th Floor, San Francisco, CA 94108.

13.     In or around August 2006, William Crafton resigned, separated and/or was terminated from Defendant CSI and opened the investment advisory firm of **Defendant MARTIN KELLY CAPITAL MANAGEMENT, LLC** (hereinafter "MKCM"), which is a duly authorized and registered investment and asset management company, who similarly advertises and holds themselves out as "specializing" in the "unique needs of…athletes" and

claims to have "insight and experience in managing investments and advising…athletes…through complex decisions."  MKCM has its principal place of business located at 11512 El Camino Real 370, San Diego, California, 92130.

14.     On or about October 26, 2009 by way of form letter, Crafton and MKCM advised Plaintiffs that they were engaged in discussion with **Defendant SUNTRUST BANK** "a leading financial institution" regarding a "non-binding proposal" to make a "strategic acquisition of [MKCM] business by acquiring substantially all of the assets of Martin Kelly."  The letter indictated that SunTrust was the "ideal partner" to help Defendant Crafton to deliver "full service, high quality wealth management services" to his professional athlete clientele. Defendant Crafton represented that he "will continue to be directly responsible for [their]account along with the other members of the Martin Kelly team who [they] know."

15.     In December 2009 **Defendant SUNTRUST BANK** purchase Defendant MKCM for its Sports and Entertainment Specialty Group, which included Plaintiffs' accounts.  The purchase price paid to Defendant Crafton by Defendant Suntrust was approximately $2,700,000.00 million dollars.  This transaction was labeled as an acquisition of assets which in actuality was the transfer of Defendant Crafton's "roster" of professional athletes (including Plaintiffs) and Crafton was announced as the head of **Defendant SunTrust's** San Diego office. **Defendant SUNTRUST** and its **Sports & Entertainment Specialty Group** are headquartered at 303 Peachtree Street, N.E., Atlanta, Georgia 30302.

16.     Then **Defendant SUNTRUST**, by way of merger, sale, acquisition, transfer or purchase acquired **Defendant CSI,** (one of Crafton's former employers during times relevant to Plaintiffs' claims) to boost its **Sports & Entertainment Specialty Group** and manage the assets of even more professional athletes.

17.     **Defendants SunTrust, CSI** and **Martin Kelly** are each registered investment advisors under the Investment Advisor Act and together, all the named Defendants have served as Plaintiffs' financial advisors and financial managers during all times relevant to the claims contained herein.

18.     **Defendants John Does 1 through 50** are individuals, partnerships, companies, corporations or other entities whom Plaintiffs are ignorant of their true names and legal capacities and therefore Plaintiffs sue these Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants designated herein as a

"**John Doe**" is responsible in some manner for the mismanagement, misrepresentation, fraud and deception, breaches, acts, omissions, and/or events alleged herein, and actually and proximately caused injuries and damages to Plaintiffs as alleged herein.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when ascertained.

## JURISDICTION AND VENUE

19.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States, more specifically Section 27 of the Securities Exchange Act, 15 U.S.C. §78(a) *et seq.*; 15 U.S.C. §78j(b); Rule 10b-5 (17 C.F.R. §240.10b-5) and 15 U.S.C. §78t(a).  In connection with the Defendants' acts, conduct and other wrongdoings complained of herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce and/or the mails.

20.     Venue lies in this Court pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1391 because, among other things, Defendants transact business in this judicial District and a substantial part of the events or omissions giving rise to the claims occurred in this District

## DEFENDANTS' ROLES AND SCHEME

21.     At all times material hereto, Defendants were able to create, control, disseminate, manage and represent all material facts and information which was made available to Plaintiffs, concerning their asset value, portfolio management and net worth. Each Defendant had discretion over Plaintiffs' money and access to undisclosed information regarding Plaintiffs' investments and Defendants had the authority/ability to prevent or correct disseminations of proper, truthful and accurate information to Plaintiffs.

22.     Defendants, in their position, each had a fiduciary duty to promptly disseminate accurate and truthful information and to correct any misleading omissions of fact regarding the financial condition, performance, operations, financial statements, and investments that Defendants made on the Plaintiffs' behalf. Despite this affirmative duty placed upon each Defendant, each knowingly and intentionally made, or participated in making or reviewed misleading statements and omissions of material fact in order to carry out investment transactions that were not in the Plaintiffs' best interests and were not suitable given the Plaintiffs' risk tolerance.

23.     The Defendants are each liable for any material false statements or omissions pleaded herein, as the statements are each "published" information for which they are collectively responsible.

24.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times, each Defendant was the principal, agent, employee, partner, associate, joint venture, successor-in-interest, co-conspirator and/or acting in concert with, and under the direction and control of, each remaining Defendant, and in doing the things alleged in this complaint, each Defendant was acting within the course and scope of these relationships.

25.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times, each Defendant conspired with each remaining Defendant, and acted in accordance with the scheme devised and enacted jointly by each such Defendant.  Among the co-conspirators are persons other than the named Defendants who are unknown to Plaintiffs, who participated in, assisted, and advised the Defendants.  Said unnamed co-conspirators (Defendant "John Does") played such a substantial role in the fraudulent misrepresentations and omissions alleged herein.

26.     In addition to the discretionary authority and control Defendants maintained over Plaintiffs' assets, Crafton and the Defendants recommended Plaintiffs use their accountants.  In what appears to be a tactical move to enhance and maintain ultimate control over Plaintiffs' assets and the information related thereto, Plaintiffs were each referred to Lavine, Lofgren, Morris and Engelberg, LLP, certified public accounts, where they were instructed to use accountant Larry J. Campbell, who has since prepared and filed most of the Plaintiffs' tax returns as well as returns for the Defendants herein.  Upon information and belief, Crafton and Campbell have a personal relationship which allowed Crafton to control Plaintiffs' asset and tax information.

## FACTS PERTINENT TO ALL PLAINTIFFS

27.     Beginning in or around 2006 and thereafter Defendant Crafton became the investment advisor and money manager of each of the Plaintiffs, who by the time of the filing of this complaint had all terminated their relationship with Defendant Crafton and his respective companies.

28.     Defendant Crafton, at all times relevant to this Complaint, was registered as an investment advisor working under the supervision and control of Defendants CSI, MKCM and SunTrust Bank or their subsidiaries and affiliates each of which are broker-dealers registered

with the United States Securities and Exchange Commission and were authorized to conduct business in the United States.

29.     From the inception of Defendant Crafton's representation of each Plaintiff, Plaintiffs each had specific conversations with Crafton about employing a conservative investment strategy, with a liquid portfolio of assets aimed at preserving the money that each Plaintiff had and would accumulate during their professional athletic career. Crafton expressly understood and acknowledge the short and unsecure nature of income that accompanies playing professional sports, especially professional football in the NFL where the average career lasts only 3-4 years and so he assured Plaintiffs he was a very conservative, low risk taking money manager.

30.     Defendant Crafton employed the same schemes and strategies in soliciting the assets, trust and confidence of each Plaintiff, by specifically representing to them that he was a "licensed and registered financial advisor"; and, he was "approved by the N.F.L Players Association"; and he represented significant professional athletes in multiple sports; and he employed a very conservative, safe and liquid investment strategy aimed at growth with little to no risk.  Crafton specifically told each Plaintiff that they could, at any time, get out of the investments Crafton placed them in because he said every investment he placed them in was a very safe, liquid asset.

31.     However, contrary to his express representations, starting in 2005 with Plaintiff A.J Feeley and then following with Heather Mitts and then Plaintiffs Curtis and Celek, Defendant Crafton placed each Plaintiff in high-risk, alternative investments, which were Ponzi schemes or other fraudulent investments run, managed, controlled, operated and/or created by individuals with whom Crafton had a personal relationship, business dealings or kick-back agreements.  These investments were unsuitable and illiquid and Crafton had some financial interest and undisclosed relationship with each investment that was never disclosed to Plaintiffs.

32.     Crafton and Defendants CSI, Martin Kelly and SunTrust each failed to advise Plaintiffs that Crafton, improperly utilizing his discretionary authority over Plaintiffs' assets, would materially change Plaintiffs' stated and known investment strategies and would instead concentrate the Plaintiffs' investment portfolio in unsuitable, privately held, unsecured, illiquid securities.

33.     Crafton knowingly made false and material misrepresentations to Plaintiffs before the date Crafton placed Plaintiffs into certain high-risk, illiquid investments, by stating he would take Plaintiffs' money and invest it in safe investments that would provide a steady stream of income to Plaintiffs throughout their lives.

34.     In fact, Crafton at various times throughout his relationship with Plaintiffs, sold, merged or transferred their assets among the various Defendants CSI, Martin Kelly and Suntrust and in doing so the Defendants made express and affirmative representations to Plaintiffs about their financial safety and well-being, Defendants' expertise in handling wealth management for professional athletes and how the Defendants "specialize" in the Sports and Entertainment field.

35.     For example, by way of letter dated October 26, 2009, Defendants Crafton and MKCM advised Plaintiffs that they were engaged in discussion with SunTrust Bank "a leading financial institution" regarding a "non-binding proposal" to make a "strategic acquisition of [MKCM] business by acquiring substantially all of the assets of Martin Kelly."  The letter stated that SunTrust was the "*ideal partner*" to help Crafton to deliver "*full service, high quality wealth management services*."  Crafton represented that he "will continue to be directly responsible for [their]account along with the other members of the Martin Kelly team who [they] know."

36.     Contrary to statements and representations such as these Defendant Crafton did not invest Plaintiffs' money in safe investments and did not provide high-quality wealth management services, but rather misappropriated their funds for his personal use; invested Plaintiffs' money in illiquid, high risk, alternative investments; invested Plaintiffs' money in Ponzi schemes run by his friends and colleagues; and/or transferred and/or commingled Plaintiffs' money among other investors and athletes whom Crafton represented to prevent them from discovering Crafton's frauds, schemes and poor investment strategy as well as Plaintiffs' financial losses.

37.     Crafton never advised Plaintiffs of his relationship with these people and entities, never disclosed that he received substantial commissions and kick-backs for investing Plaintiffs' money in these investments, and was able to manipulate the actual dissemination of information concerning these investments, their holdings and the actual worth so that Plaintiffs could not discover the truth about their investments, their portfolio's actual value or Defendants' investment strategies for their assets.

38.     Crafton and his staff followed Crafton from CSI to MKCM to SunTrust and they actively participated in Crafton's scheme to generate commissions for himself, capital for his colleagues' Ponzi schemes and to obtain a high valuation of Crafton's "roster" of professional athletes so Crafton could sell his "roster" among Defendants, who paid in excess of $2,700,000.00 for Crafton's "roster."

39.     By way of example, Martin Struthers, an employee and investment advisor with Crafton and his various companies, had a personal relationship with Matt Jennings, the principal of Westmoore who is now under Federal investigation. Mr. Sturthers was registered as a "broker" for Westmoore while he was also employed with Crafton at Defendants CSI, Martin Kelly and/or SunTrust Bank.  Similarly, Crafton invested Plaintiffs in a "Mar Vista" fund which Crafton was a "partner" however, Crafton never disclosed that fact to Plaintiffs.  Like Westmoore, Mar Vista was an illiquid, high-risk alternative investment for which Plaintiffs' lost essentially all of their investment.

40.     Defendants were each negligent and failed in their independent fiduciary duties to Plaintiffs  by allowing Crafton to invest, in many cases, more than 60% of the Plaintiffs' assets in high-risk and illiquid, alternative investments and Ponzi schemes, some of which Crafton and his team of advisors had personal relationships with and/or were actually registered "brokers" for said investments.

41.     Defendants never requested or required Plaintiffs to complete client profiles or investment objective statements; Defendants never developed investment programs for each Plaintiff; Defendants failed to define any of Plaintiffs' financial risks and Defendants failed to follow industry standards in assessing Plaintiffs' risk tolerances and in setting up a proper investment portfolio for Plaintiffs based upon their age, income, assets and long term financial needs.

42.     Defendants each breached their respective duties to Plaintiffs by failing to disclose Crafton and Struther's relationship with Jennings and Westmoore as well as monitoring and controlling Crafton's conduct.

43.     In or around August 2010, Defendant SunTrust and its team of financial advisors began informing the "roster" of players including Plaintiffs, that a major investment Defendant Crafton had placed them in (the Westmoore Fund) was under investigation and placed into

receivership by the Securities Exchange Commission ("SEC") as the result of an investigation and lawsuit filed by the SEC.

44.     It was not until late August 2010 when SunTrust advised Plaintiffs of the SEC action that Plaintiffs actually learned that their investments, placed, managed and controlled by Defendants were essentially worthless.  The actions and conduct of Defendant Crafton and his various Defendant Companies including MKCM and SunTrust Bank, constituted active and/or fraudulent concealment that tolled the statute of limitations for any Federal or State law claims set forth herein.

45.     Furthermore, at that time in late August, 2010 when Plaintiffs learned about Westmoore, Crafton and his financial advisory Team, who were employed by Suntrust as a result of the acquisition of MKCM by SunTrust, began a telephone and email campaign with Crafton's "roster" of players **assuring** them that nothing was wrong, that Plaintiffs' money was safe and that Defendant SunTrust was attempting to create problems and misstate facts so that Crafton's "roster" of players (including Plaintiffs) would change financial advisors from Crafton to other members of the SunTrust Sports & Entertainment Group and that would enable SunTrust to terminate Crafton's three (3) year contract.

46.     For months, Crafton and his team of co-conspirators assured these professional athletes, including Plaintiffs that their investments were safe and secure and there was nothing to worry about.  In fact one certified M.L.B agent James Lindell advised certain Crafton clients, that "SunTrust has people that hold no professional licenses calling people…and questioning things Billy had [his client] do. [Lindell's] attorney is currently drafting a cease and desist letter to SunTrust.  What they are doing is unethical at the very minimum.  Their obvious motive is to discredit Billy and anything he did with the hope you will stay with SunTrust." [Source: Nov 17, 2010 email from James Lindell]

47.     Shortly thereafter, by way of letter dated February 17, 2011 from SunTrust's Managing Director of the Sports & Entertainment Group, Thomas Carrol, Defendant SunTrust advised Crafton's roster of professional athletes, including Plaintiffs, that as a follow-up to SunTrust's November, 2010 notice, Defendant Crafton was "no longer employed by SunTrust Bank."

48.     At that time in February, 2011, SunTrust was stressing with Crafton's "roster" of players, specifically Plaintiffs herein, the important need to have SunTrust and Plaintiffs "define

investment objectives in order for [Suntrust] to continue managing [their] accounts."  At no time prior thereto had Defendants CSI, MKCM or SunTrust requested or required Plaintiffs to complete any client profiles, risk tolerances questionnaires or investment objectives questionnaires.  In fact, as the letter clearly states, no Defendant broker-dealer named herein ever defined Plaintiffs' investment objectives, developed an investment program or completed any industry standard investment objective or risk tolerance forms.

49.     Meanwhile, Defendant Crafton had been allowed to manipulate Plaintiffs' portfolio values and was making significant transfers and purchases of unsuitable, illiquid and unsafe alternative investments and was issuing fraudulent certificates to Plaintiffs in an attempt to conceal Plaintiffs' actual monetary losses from the investments Crafton placed them in and all the while Defendant Crafton was employed by and under the oversight, supervision and control of Defendants CSI, MKCM and SunTrust.

50.     Because Crafton was a registered representative, agent, advisor, owner, partner, member and/or employee of Defendants CSI, MKCM and SunTrust Bank, each employer/Defendant had a duty to supervise, monitor, audit, control and prevent the conduct of Crafton and his team which occurred here.  Each Defendant violated their fiduciary duties to Plaintiffs by failing to properly supervise, oversee, audit, investigate, review, monitor and control Crafton's conduct.

51.     Plaintiffs are now informed and believe that Defendants overvalued Plaintiffs' investments and asset portfolio; failed to disclose the high-risk and/or illiquid nature of these investments to Plaintiffs; disseminated false and misleading portfolio statements and asset information; made assurances to Plaintiffs as to the security and safety of these alternative investments by insisting that he/they too, had money "in the game" and Defendants misrepresented the value and security of these alternative investments to the Plaintiffs to dismiss and dispel any notion that the investments were abnormally volatile, risky, unsuitable and/or illiquid.

52.     Defendants circulated copies of subscription agreements and subscription booklets and other documents to Plaintiffs which set forth misleading statements due to the omissions of material facts and true nature of the investment.

53.     Certain John Doe Defendants whose names are unknown, conspired with the named Defendants and drafted, revised, participated in and advised the Defendants with respect

to the foregoing material misrepresentations and omissions in documents issued to Plaintiffs. Said John Doe Defendants conspired and participated in drafting the documents knowing that they were intended to be relied upon by Plaintiffs. Said co-conspirators further knew, or were reckless in not knowing, of the continuing decline of the investments and knew, or should have known, of the substantial risks or loss to investors in the alternative investments.

54.     If Defendants CSI, MKCM and SuntTrust had properly supervised, controlled, monitored or audited Crafton and its employees, Defendant Crafton would not have been able to perpetrate his fraudulent schemes and improper conduct, Plaintiffs would not have remained in these alternative investments, Plaintiffs would have known of the significant risks associated with the investments and Defendants could have and would have prevented the Plaintiffs' from losing millions of dollars of their money that Crafton had placed in these alternative investments.

55.     Defendants' failure to properly supervise Crafton included numerous red flags which should be considered notice to Defendants of Crafton's actions, including:

   a.     SunTrust performed a due diligence investigation into Crafton's clientele prior to acquiring Crafton's business assets in November 2009;

   b.     MKMC and SunTrust realized that Crafton never had Plaintiffs complete investment profiles, risk tolerance questionnaire or other industry standard investment profiles;

   c.     MKMC and SunTrust knowing and allowing Crafton to ignore industry standard document retention systems and requirements;

   d.     Allowing Crafton to operate without having developed or defined written investment objectives for Plaintiffs.

**The "Interested" Transactions and Investment Advisors' Act of 1940**

56.     Defendants' transactions, initiated on behalf of the Plaintiffs were "interested," self-dealing transactions, requiring consent by investors under the Investment Advisors Act of 1940. In these transactions, Defendants knowingly acted as principals in selling investment securities without proper disclosure or informed consent of Plaintiffs, their clients, as required by section 206(3) of the Investment Advisors Act of 1940.  Defendants were subject to said statute and regulations such as 17 CFR Section275.206(3)-(2) and SEC Release No. IA-1732, which require (i) a written consent prospectively authorizing the completion of such self-dealing transactions ("agency cross transactions for an advisory client"), (ii) after *full disclosure*

including pricing and "best price" to enable the client to make an *informed decision* to consent to the transaction, with (iii) the Investment Advisor and affiliated parties consistently acting in the best interests of the client. Defendants failed to obtain the required informed consent, or any consent, to their scheme.  By this failure to obtain investors' consent, Defendants knowingly defrauded Plaintiffs.

57.     Upon information and belief Crafton placed Plaintiffs into alternative investments and then allowed said alternative investment companies to act as Plaintiffs' broker-dealer for Plaintiffs investment of money into subsequent alternative investments.

**The Defendants Failure to Seek Approval of the Transactions**

58.     On information and belief, based on Defendants' access to Portfolio records, confidential information and knowledge of current market conditions, Defendants failed to seek any adequate, informed consent from Plaintiffs for the alternative investments because Defendants knew the transactions were unsuitable or inconsistent with Plaintiffs' risk tolerance and investment strategy.

59.     Similarly, Defendants also failed to make any effort to *directly* disclose the terms of the self-dealing transactions to Plaintiffs.

**Undisclosed Amounts Required by the Transactions**

60.     As Plaintiffs continue to investigate they have come to learn, the Defendants were paid undisclosed and unanticipated commission amounts on account of Plaintiffs' investments.

**<u>COUNT I:</u>**

**Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

61.     Plaintiffs repeat and re-allege each allegation set forth herein.

62.     Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. Section 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. Section 240.10b-5, in that they:

> a.  Employed devices, schemes, and artifices to defraud;
>
> b.  Made untrue statements of material facts or omitted material facts which, in light of the circumstances, needed to be disclosed in order to make the statements made not misleading; and
>
> c.  Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiffs in connection with their investment decisions.

63.     As alleged above, Defendants, by and through their agents and representatives, intentionally, carelessly and/or recklessly misrepresented and omitted material facts in connection with the sale of securities and other investments to Plaintiffs.

64.     More specifically, Defendants' misrepresentations and omissions were intended to deceive and did deceive the Plaintiffs, for the purpose of causing the Plaintiffs to invest in risky and/or illiquid "alternative investments" that did not match Plaintiffs' risk tolerance.  For instance, Plaintiffs funds were contributed to various known Ponzi-schemes, including the Westmoore Fund, the value of which is essentially zero and the actual Fund is in receivership. Defendant Crafton had inside information about the liquidity and security of this Fund and he was in fact, friends and sharing commissions with the Fund CEO, Matthew Jennings.

65.     At all times material hereto, the Defendants failed to make disclosures to the Plaintiffs, including those necessitated by Securities Law and the usual custom of the financial community, and the Defendants failed to obtain the informed consent required for certain self-interested and self-dealing transactions.

66.     The Defendants owed Plaintiffs a duty to avoid misrepresentations and omission of material facts regarding their investments under Section 10(b) of the Securities Act of 1934 and Rule 10b-5 promulgated thereunder.  Despite this duty, the Defendants made these misrepresentations and omissions knowingly, with the intent to deceive and defraud the Plaintiffs, and with reckless disregard for the truth and materiality thereof, for the purpose of inducing Plaintiffs to invest so that the Defendants could earn lucrative commissions and fulfill other self-serving financial objectives.

67.     Plaintiffs reasonably relied on Defendants' representations, in light of the Defendants' reputation in the investment community and based on the representations Crafton made about the safety and security of these alternative investments.

68.     Unbeknownst to the Plaintiffs at all times materially hereto, the investments recommended by the Defendants primarily served to benefit the Defendants' interests at the expense of the Plaintiffs' interest, in contravention of Section 10(b) of the Exchange Act and Rule 10b-5.

69.     As a direct, proximate, and foreseeable consequence of the Defendants' misrepresentations, nondisclosures, and omissions, Plaintiffs invested in the alternative investments that were being promoted by the Defendants, which caused the Plaintiffs to suffer

extensive monetary damage due to the instant diminution in the value of the alternative investments, the illiquidity of said investments which eventually resulted in their complete loss; the unreasonable management fees and commissions extracted by the Defendants during the relevant time period, and the self-dealing nature of the investment.  Plaintiffs' financial loss was thereafter exacerbated by the Defendants' active concealment of the initial diminution in the value of Plaintiffs' capital contributions as well as Defendants' lack of supervision and oversight of these investments resulted in Plaintiffs' continued investment in these alternative investments and resulted in almost a complete monetary loss of Plaintiffs' entire investments.

70.     The quantification of Plaintiffs' aforesaid damages and losses shall be proven at trial.

## COUNT II

### Violation of Section 20(a) of the Securities Exchange Act Against Defendants SunTrust, CSI and Martin Kelly Capital Management

71.     Plaintiffs repeat and re-allege each allegation set forth herein.

72.     Defendants SunTrust, CSI and Martin Kelly Capital Management exercised control over Defendant Crafton's operations as a registered representative.

73.     Defendant Crafton is an individual liable under Section 10(b) of the Exchange Act as specified in Count I.

74.     Defendants SunTrust, CSI and Martin Kelly Capital Management had the power and authority to control Defendant Crafton with respect to the wrongful conduct complained of herein and failed to do so.

75.     By reason of Defendants SunTrust, CSI, Martin Kelly Capital Management, and Crafton's conduct, both are jointly and severally liable pursuant to Section 20(a) of the Securities Exchange Act for damages specified in and arising from Count I, above.

## COUNT III

### Rescission under Securities Exchange Act of 1934, Section 29(b) Against All Defendants

76.     Plaintiffs repeat and re-allege each allegation set forth herein.

77.     Plaintiffs entered into contracts with Defendants directly and indirectly upon signing their respective Subscription Agreements and receipt of the PPMs.

78.     Each such contract entered into by Plaintiffs was made in violation of Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, due to the

misrepresentations and omissions of material facts as hereinabove alleged.  Furthermore, each such contract has involved violations of said Section 10(b) and Rule 10b-5

79.     Section 29(b) of the Securities Exchange Act of 1934 provides that any such contract (i) made in violation of, or (ii) involving performance thereof that violates, Section 10(b) or Rule 10b-5, shall be void as to any person who, in violation thereof, shall have made or engaged in the performance of any such contract.

80.     None of the contracts entered into by Plaintiffs are executory, but rather have been performed in full by the Plaintiffs through Plaintiffs' contribution of capital and payment of management fees and commissions to Defendants.

81.     Rescission and restitution of funds invested is the appropriate remedy because Defendants' fraud was not collateral to, but rather of central materiality to Plaintiffs, who invested in the alternative investments.

82.     Rescission and restitution of funds invested is also appropriate because the equities balance much more strongly in favor of Plaintiffs, who are primarily or exclusively nonprofessional, individual investors who invested their personal savings and now wish to have the security of their savings attended to by persons who did not defraud them. There is no inequity to Defendants, because Defendants knowingly undertook a fraudulent scheme to further their own interests.

## <u>COUNT IV</u>

### **Joint and Several Liability as Crafton's Principal**

83.     Plaintiff repeats and re-allege each allegation of set for herein

84.     Defendants CSI, Martin Kelly and SunTrust bank are liable for the conduct of Crafton described in this Complaint under the Doctrine of Respondeat Superior or vicarious liability because as a registered representative and, on information and belief based on FINRA records, registered principal, Crafton was an agent of Defendants CSI, Martin Kelly and SunTrust Bank.   Furthermore, based on said FINRA records, Crafton was actually an employee of said Defendants.  The conduct herein described fell within the scope of his authority as an agent or within the scope of his employment because:

a. The acts and omissions arose from acts of Crafton involving the sale of securities and giving financial advice are the types of acts that Crafton was engaged or employed to do on behalf of said Defendants.

b.  The fraud arose from acts done substantially within the authorized time and place for Crafton to perform acts on behalf of said Defendants for the Plaintiffs, because (i) Crafton operated offices which were the branch or principal offices of Defendants; (ii) the fraudulent misrepresentations complained of occurred through the mail, phone or internet from the offices that Crafton worked out of; and (iii) Crafton maintained his files and paperwork at the offices of said Defendants.

c.  The fraudulent acts were committed by Crafton with at least the partial intention of furthering the financial and business interests of Defendants CSI, Martin Kelly and SunTrust.  It was announced and make public that SunTrust Bank had purchased MKMC and CSI for the purpose of increasing its Sports and Entertainment Specialty Group and expanding its offices to San Diego where Crafton was be the "head" of the office.

d.  At least, defendant SunTrust Bank performed a due diligence analysis of Crafton's business and client based along with the Plaintiffs' assets prior to acquiring Crafton's interests in Martin Kelly, such that SunTrust knew or should have known about Crafton's actions, misrepresentations, lack of documentation and paperwork, improper document retention system, lack of investment strategies and portfolios for Plaintiffs as well as the investments Crafton had placed Plaintiffs in.

85.  Plaintiffs may recover from said Defendants punitive damages arising from the acts, omissions, misrepresentations and fraud of Crafton, Defendants' agent, because they can and should be considered to have been performed by Crafton in furtherance of Defendants' business and within the scope of Crafton's employment with said Defendants.

86.  The quantification of Plaintiffs' aforesaid damages and losses shall be proven at trial.

### COUNT V
### Bad Faith Breaches of Fiduciary Duty under Applicable State Laws
### Against All Defendants

87.  Plaintiffs repeat and re-allege each allegation set forth herein.

88.  Each of the Defendants, in their capacities alleged herein, owed fiduciary duties of loyalty, care, and good faith to the Plaintiffs.

89.  The fiduciary duties of loyalty, care and good faith owed by Defendants to Plaintiffs required Defendants to:

   a.  Make full and timely disclosure of all material facts pertaining to Plaintiffs' investments;

   b.  Obtain Plaintiffs' informed consent prior to the investment transactions undertaken by Defendants as Plaintiffs' advisor and principal manager.

   c.  Adequately diversify Plaintiffs' investments so as to insulate the Plaintiffs from an unreasonable amount of risk.

90.  In making alternative "high-risk" investments that were directly adverse Plaintiffs' interests, and committing the actions and omissions alleged hereinabove, both prior to and after Plaintiffs had invested in same, the Defendants breached their fiduciary duties to the Plaintiffs.

91.  Furthermore, the Defendants failure to disclose the self-dealing nature of the transactions deprived the Plaintiffs of the opportunity to review any conflicts of interests that may have existed and in doing so, the Defendants breached their fiduciary duties of loyalty and care to the Plaintiffs.

92.  The above-alleged breaches of fiduciary duties were undertaken and committed by Defendants intentionally and in bad faith, by willful misconduct, intentional fraud and by gross negligence, and in knowing disregard of Plaintiffs' rights.

93.  A such, the above-alleged breaches of fiduciary duties violate Defendants' duties under Pennsylvania common law.

94.  As a direct and proximate result of all Defendants' breaches, Plaintiffs have suffered damages in an amount to be determined at trial.

<u>**COUNT VI**</u>
**Fraudulent Misrepresentation Against All Defendants**

95.  Plaintiffs repeat and re-allege each allegation set forth herein.

96.  Defendants represented to the Plaintiffs that, among other things, they would act in the best interests of the Plaintiffs in making investment decisions, and that the Plaintiffs' investment strategy would be one involving conservative investments to maximize returns while protecting their principal investment.

97.     Additionally, Defendants represented that they would conduct frequent and timely due diligence in order to optimize the return on Plaintiffs' investments and to protect Plaintiffs from substantial volatility in the investments.

98.     The Defendants had discretionary authority to invest on Plaintiffs' behalves and Defendants were responsible for or involved in the drafting and/or review and approval of investments.  As Plaintiffs' investment managers, Defendants also had a fiduciary duty to refrain from making fraudulent statements and to rectify any and all material misrepresentations and omissions once they became apparent.

99.     The Defendants' representations were false.  Specifically, Defendants refrained from the record keeping and due-diligence that was custom within the investment community and the Defendants continued to perpetuate investments in vehicles that were "high-risk" and converse to Defendant's representations that the Plaintiff's principal would be liquid and protected.

100.    The Defendants made the representations with knowledge of their falsity, reckless disregard for their truth, or without reasonable grounds for believing the representations to be true when they were made.

101.    The Defendants intended that Plaintiffs would rely on the representations in deciding whether to invest in said alternative investments.

102.    Plaintiffs justifiably relied on the Defendants' representations and it was not otherwise apparent that Defendants' assertions were false.

103.    Defendant's misrepresentations caused the Plaintiffs to invest with Defendants and to refrain from withdrawing their capital investments when it was immediately apparent that the investments would continue to decline in value.

104.    Plaintiffs suffered financial harm due the immediate diminution of the value of their investments and from Defendants' self-dealing transactions without disclosure of material terms or obtaining informed consents therefor.

105.    Plaintiffs' reliance on the Defendants' representations was reasonable and justifiable, and was a substantial factor in causing their harm, as the representations contributed to the information available to Plaintiffs at the time they decided to invest in the Partnerships.

106.    As a direct and proximate result of all Defendants' actions Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT VII

### Willful Breach of Covenant of Good Faith and Fair Dealing Against All Defendants

107.    Plaintiffs repeat and re-allege each allegation set forth herein.

108.    The contractual relationship between Plaintiffs and Defendants included an implied covenant of good faith and fair dealing, which requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract.  A breach of the covenant of good faith and fair dealing may occur even without violating an express term of the contract.

109.    Defendants violated the implied covenant of good faith and fair dealing, where Defendants made investments without obtaining Plaintiffs' consent and without adequate disclosure.

110.    Defendants' actions were undertaken in bad faith, for the sole purpose of benefiting the Defendants at Plaintiffs' expense.  In effect, the Defendants' conduct induced the Plaintiffs' to enter into a contract that would allow Defendant's to purchase investment vehicles that were substantially over-valued, but would adequately serve the Defendants' own financial purposes and self-dealing motivations.

111.    Defendants' conduct was done in bad faith, by willful misconduct, fraud and gross negligence, and deprived the Plaintiffs of a number of bargained-for benefits under their contracts with the Defendants, and therefore breached the duty of good faith and fair dealing.

112.    As a direct and proximate result of all Defendants' actions Plaintiffs have suffered damages in an amount to be determined at trial.

### COUNT VIII
### Negligence Against All Defendants

113.    Plaintiffs repeat and re-allege each allegation set forth herein.

114.    The Defendants owed Plaintiffs a duty to act with due care in carrying out any transactions on behalf of the Plaintiffs and/or in identifying, sourcing, negotiating, structuring, analyzing and effectuating any investments for the benefit of the Plaintiffs. The Defendants also owed Plaintiffs a duty to act with due care in evaluating and managing the assets of the Plaintiffs. Additionally, Defendants owed Plaintiffs a duty to exercise reasonable care in disclosing the material terms of any transactions engaged in on behalf of the Plaintiffs within a reasonable

period of time, and to correct in an expedient manner any representations regarding such transactions that may have been misleading to the Plaintiffs.

115.    In identifying, analyzing, negotiating, structuring, approving and making the investments, and in failing to disclose the material terms of those transactions in a reasonably expedient manner thereafter, and failing to correct misleading representations regarding the alternative investments and the management and investment objectives of the Plaintiffs in general, Defendants breached their duties of care owed to the Plaintiffs.

116.    As a direct and proximate result of the Defendants' negligence, Plaintiffs suffered harm in the amount of their proportionate share of the millions of dollars in overpayments and losses on investments, as well as management fees and other charges paid to the Defendants during the period of time that the Defendants acted negligently and breached the numerous duties owed to Plaintiffs.

117.    The quantification of Plaintiffs' losses and damages shall be proven at trial.

## COUNT IX
### Negligent Supervision/Training Against Defendants SunTrust and Martin Kelly Capital Management

118.    Plaintiffs repeat and re-allege each allegation set forth herein.

119.    Defendants SunTrust and Martin Kelly Capital Management had a duty to supervise their employees, including Defendant Crafton, and to ensure that their employees undertook proper due diligence and made any and all requisite disclosures, particularly concerning the high-risk alternative investments its employees were promoting to the Plaintiffs.

120.    Defendants SunTrust and Martin Kelly Capital Management also had a duty to investigate employees that failed to make proper disclosures or keep proper records and to remediate any of their employees' improper and/or fraudulent conduct once they became aware of such conduct.

121.    On information and belief, Defendants SunTrust and Martin Kelly Capital Management breached that duty by failing to provide the necessary supervision and/or training. Specifically, SunTrust and Martin Kelly Capital Management failed to require its employees to provide complete disclosure and in doing so, the Defendants ratified their employees' decisions to withhold pertinent financial information that would have otherwise informed the Plaintiffs of the rapid deterioration of their capital contributions.

122.     As a direct and proximate result of Defendants SunTrust and Martin Kelley Capital Management's breach of their duty to supervise their employees, Plaintiff suffered financial harm when Defendant Crafton failed to provide the necessary disclosures and failed to refrain from fraudulent, self-interested, and self-serving conduct.

123.     The quantification of Plaintiffs' losses and damages shall be proven at trial.

## COUNT X
### Negligent Hiring/Retention Against Defendants SunTrust

124.     Plaintiffs repeat and re-allege each allegation set forth herein.

125.     Defendant SunTrust owed a duty to the Plaintiffs and other investors to assemble an investment team that provided investment services that were transparent, based on truth rather than concealment, and were otherwise non-fraudulent in nature.

126.     On information and belief, Defendant SunTrust breached that duty by failing to investigate adequately the background and abilities of its employees it hired, including Defendant Crafton, who came to be an employee of SunTrust by way of SunTrust's *$2.7 million dollar* acquisition of Crafton's Martin Kelly Capital Management.  Specifically, Defendant SunTrust breached its duty of care, when it hired employees that were not adept and familiar with the financial disclosure required by law or as a matter of custom within the financial community.

127.     As a result of Defendant SunTrust's breach of its duty to hire and retain only competent and forthright professionals, Plaintiffs suffered financial harm the amounts of which are to be proven at trial.

## COUNT XI
### Failure to Warn Against All Defendants

128.     Plaintiffs repeat and re-allege each allegation set forth herein.

129.     Defendants promoted and recommended alternative investments, with high-risk and illiquid profiles that were foreseeable to the Defendants at all times but not readily recognizable to an ordinary or lay investor.

130.     Defendants could have reduced or avoided the risk associated with these alternative investments by providing reasonable instructions or warnings to the Plaintiffs as well as providing the usual and customary oversight of Plaintiffs' investment accounts.

131.    Defendants failed to properly identify the alternative investments Plaintiffs' capital had been contributed to and as such, Defendants failed to identify, disclose, and warn the Plaintiffs of the risks associated with those particular investments with any degree of specificity.

132.    As a direct and proximate consequence of the Defendants failure to warn the Plaintiffs, Plaintiffs suffered substantial financial harm and the instantaneous diminution of their capital contributions; a consequence that was not readily apparent or foreseeable to the Plaintiffs at any time, especially considering Defendant's misstatements and misrepresentation and ultimate failure to warn the Plaintiffs of the risk inherent in these investment vehicles.

133.    Plaintiffs' aforesaid losses shall be proven at the time of trial.

## COUNT XII
### Alternative Derivative Claim Against All Defendants

134.    Plaintiffs repeat and re-allege each allegation set forth herein.

135.    The allegations of this Count are intended in the alternative to the theories of recovery alleged above. These allegations are intended to apply only in the event that the allegations of other Counts are found insufficient and cannot be amended, as a matter of law.

136.    Plaintiffs have repeatedly made demand on Defendants for refunds of investments made into the investments and Plaintiffs and have been refused, denied, and rejected, and to the extent any such request has been insufficient to encompass the entire subject matter hereof, it would be useless and futile to attempt any further.

## COUNT XIII
### Professional Negligence/Malpractice

137.    Plaintiffs repeat and re-allege each allegation set forth herein.

138.    Defendants SunTrust, CSI, Martin Kelly and Crafton were responsible for investing Plaintiffs' account in accordance with Plaintiffs' stated conservative investment strategy and each Defendant had an independent duty to exercise proper care, prudence and professional responsibility in handling, managing and investing Plaintiffs' money.

139.    Defendants failed to exercise prudence, care and professional responsibility in investing, managing, diversifying, monitoring and safeguarding Plaintiffs' investments and assets under their management.

140.    Defendants ignored industry standards, industry literature and numerous red flags associated with the investment strategy employed with respect to Plaintiffs' investment accounts

and otherwise failed to perform due diligence and review of the investments Defendants placed Plaintiffs' into and utterly failed to monitor said investments.

141.    As a direct and proximate result, of Defendants' professional negligence and malpractice Plaintiffs basically lost their entire investment accounts, the exact amount of which will be proven at trial.

## JURY DEMAND AND PRAYER FOR RELIEF

142.    Plaintiffs hereby demand a trial by jury on all issues.

WHEREFORE, Plaintiffs pray for the following relief and judgment against the Defendants

individually, jointly, severally and in the alternative:

A.    Rescission of the subscription agreements between each Plaintiff and the alternative investment/General Partner, or alternatively, monetary damages restoring each Plaintiff to the position he/she/it would have occupied had the subscription agreements/ alternative investments never been made, according to proof;

B.    Compensatory Damages for Breaches of Fiduciary Duty;

C.    Disgorgement of management fees, performance fees, costs, other fees and interest paid to Defendants during the relevant time periods;

D.    Punitive Damages for the willful, wanton and fraudulent acts of Defendants;

E.    Monetary judgment against Defendants for an amount equal to the damages each suffered as a result of Defendants actions complained of;

F.    Reasonable attorneys' fees and litigation costs associated with this litigation;

G.    Pre-judgment interest; and

H.    Such other and further relief as the Court deems just and proper.

For the Plaintiffs


BY:_____
          Andrew M Smith, Esquire
          Counsel for Plaintiffs